IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

JERRY CHARLES RODRIGUEZ,

      Petitioner,

v.                                Case No.  1:15cv140-WTH/CAS

JULIE L. JONES, Secretary,
Department of Corrections,
et al.,

      Respondent.
_____/

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

      Petitioner, Jerry Charles Rodriguez, a prisoner in the custody of the

Florida Department of Corrections, proceeding pro se, filed a petition for

writ of habeas corpus pursuant to 28 U.S.C. § 2254 with exhibits on July 9,

2015, under the mailbox rule.  ECF Nos. 1 & 2.  The Court directed that an

amended petition be filed and on August 6, 2015, Petitioner filed an

amended petition with supporting memorandum and exhibits.  ECF Nos. 6

& 7.  Respondent filed an answer with exhibits on May 9, 2016, ECF

No. 19, and Petitioner's reply was filed on December 5, 2016.  ECF No. 29.

Petitioner challenges his convictions dated November 9, 2006, following a

jury trial, and his sentences entered November 29, 2006, in the Eighth Judicial Circuit, Alachua County, Florida.

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B).  After careful consideration of all the issues raised, the undersigned has determined that no evidentiary hearing is required for disposition of this case.  *See* Rule 8(a), R. Gov. § 2254 Cases in U.S. Dist. Cts.  For the reasons set forth herein, the pleadings and attachments before the Court show that Petitioner is not entitled to federal habeas relief and this amended § 2254 petition should be denied.

## Background and Procedural History

Petitioner was charged by second Amended Information on November 6, 2006, in the Eighth Judicial Circuit in and for Alachua County, Florida, with four counts.  Ex. A at 25-26.  Count 1 charged attempted first-degree murder of John Edward Curtis on April 20, 2006, in violation of section 782.04(1)(a), Florida Statutes; Count 2 charged robbery of John Edward Curtis with a firearm in violation of sections 812.13(2)(a) and 775.087(2)(a), Florida Statutes; Count 3 charged conspiracy to commit the crime of robbery on April 20, 2006, in violation of sections 777.04 and

812.13, Florida Statutes; and Count 4 charged kidnapping of Ariel Garis

with the intent to commit or facilitate commission of a felony, to wit: sexual

battery or bodily harm upon or terrorize the victim or any person, on April

20, 2006, in violation of section 787.01(1)(a), Florida Statutes.  Ex. A at 25-

26.[1]

Jury trial was held on November 7- 9, 2006, at which Petitioner was

found guilty of attempted second-degree murder, armed robbery,

conspiracy, and false imprisonment.  Ex. A at 63-65; Ex. B-5.  He was

sentenced to fifteen years in prison for Count 1, life in prison for Count 2,

five years in prison for each of Counts 3 and 4, all sentences to be

concurrent to the sentence in Count 2, with 141 days credit for time served.

Ex. A at 69-75.  Petitioner appealed, raising one claim—the trial court erred

in allowing repeated references to the Petitioner's alleged gang

membership because the prejudice from these references outweighed any

probative value.  Ex. H.  The state First District Court of Appeal affirmed

per curiam without explanation on February 22, 2008.  Ex. K.  The mandate

issued on March 11, 2008.  Ex. L.  *See* Rodriguez v. State, 974 So. 2d

1072 (Fla. 1st DCA 2008) (table).

---

[1] Hereinafter, citations to the state court record, "Ex. –," refer to exhibits A through CC submitted with Respondent's answer, ECF No. 19, unless otherwise indicated.

Petitioner filed a pro se motion to correct illegal sentence pursuant to Florida Rule of Criminal Procedure 3.800(a) on July 23, 2008, Ex. M at 1-5, which was denied on August 8, 2008.  Ex. M at 6-19.  Petitioner appealed and the state appellate court affirmed per curiam without explanation on December 22, 2008.[2]  Ex. N.  The mandate issued on February 17, 2009. Ex. L.  *See* Rodriguez v. State, 1 So. 3d 182 (Fla. 1st DCA 2008) (table).

Petitioner filed a pro se petition for writ of habeas corpus in the state First District Court of Appeal, Ex. P, alleging that his appellate counsel rendered ineffective assistance on direct appeal by failing to argue violation of Petitioner's speedy trial right which was preserved by trial counsel; by failing to argue sentencing errors; and by failing to allege fundamental error as to other evidentiary issues.  Ex. P at 3.  The state district court of appeal denied the petition on the merits on January 13, 2009.  Ex. R.  *See* Rodriguez v. State, 1 So. 3d 182 (Fla. 1st DCA 2008) (table).

On April 7, 2009, Petitioner filed his motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850.  Ex. U.  The motion was dismissed pursuant to Petitioner's notice of voluntary dismissal.  Ex. V, W. A second Rule 3.850 motion was filed on October 30, 2009, Ex. X, which

---

[2] The issue on appeal from denial of the motion to correct illegal sentence was: (1) The sentence was an illegal upward departure from the recommended guidelines range. *See* Ex. M at 4.

was dismissed in part and denied in part.  Ex. Y.  Petitioner filed an

amended Rule 3.850 motion, Ex. Z, and supplemental grounds.  Ex. AA.

Before the post-conviction court ruled, Petitioner filed a second amended

Rule 3.850 motion.  Ex. BB.  The post-conviction court summarily denied all

the claims.  Ex. CC.  No appeal was filed from this order.

Petitioner filed his petition for writ of habeas corpus pursuant to 28

U.S.C. § 2254 in this Court raising one ground for relief:

> (1) The trial court erred by allowing repeated reference to
> the Petitioner's alleged gang membership and by requiring
> Petitioner to display a tattoo to the jury because the prejudice
> outweighed any probative value.  ECF No. 6 at 5.

## <u>Analysis</u>

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and

Effective Death Penalty Act of 1996 (AEDPA), federal courts may grant

habeas corpus relief for persons in state custody only under certain

specified circumstances.  Section 2254(d) provides in pertinent part:

> An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not
> be granted with respect to any claim that was adjudicated on
> the merits in State court proceedings unless the adjudication of
> the claim—
>
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  *See also* <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011); <u>Gill v. Mecusker</u>, 633 F.3d 1272, 1287 (11th Cir. 2011).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000) (O'Connor, J., concurring).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413 (O'Connor, J., concurring).

The Supreme Court has explained that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011).  The Court stated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. . . .  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no further.  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not

> a substitute for ordinary error correction through appeal.
> Jackson v. Virginia, 443 U.S. 307, 332, n.5 (1979) (Stevens, J.,
> concurring in judgment). As a condition for obtaining habeas
> corpus from a federal court, a state prisoner must show that the
> state court's ruling on the claim being presented in federal court
> was so lacking in justification that there was an error well
> understood and comprehended in existing law beyond any
> possibility for fairminded disagreement.

Id. at 102-03 (citation omitted). The federal court employs a " 'highly

deferential standard for evaluating state-court rulings, which demands that

state-court decisions be given the benefit of the doubt.' " Pinholster, 563

U.S. at 181 (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002)).

   "Before a federal court may grant habeas relief to a state prisoner,

the prisoner must exhaust his remedies in state court." O'Sullivan v.

Boerckel, 526 U.S. 838, 842 (1999); 28 U.S.C. § 2254(b). The Petitioner

must have apprised the state court of the federal constitutional claim, not

just the underlying facts of the claim or a "somewhat similar state-law

claim." Snowden v. Singletary, 135 F.3d 732, 735 (11th Cir. 1998) (quoting

Anderson v. Harless, 459 U.S. 4, 5-6 (1982)). In order for remedies to be

exhausted, "the petitioner must have given the state courts a 'meaningful

opportunity' to address his federal claim." Preston v. Secretary, Florida

Dep't of Corr., 785 F.3d 449, 457 (11th Cir. 2015) (quoting McNair v.

Campbell, 416 F.3d 1291, 1302 (11th Cir. 2005)). Petitioner must "fairly

present" his claim in each appropriate state court in order to alert the state

courts to the federal nature of the claim.  Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 275 (1971).

In order to obtain review where a claim is unexhausted and, thus, procedurally defaulted, the Petitioner must show cause for the default and prejudice resulting therefrom or a fundamental miscarriage of justice. Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993).  In order to demonstrate cause, Petitioner must show that an "external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." Alderman v. Zant, 22 F.3d 1541, 1551 (1994) (citing Murray v. Carrier, 477 U.S. 478, 488 (1986)); *see also* McCleskey v. Zant, 499 U.S. 467, 497 (1991) (emphasizing that the external impediment must have prevented the petitioner from raising the claim).

A federal court may grant a habeas petition on a procedurally defaulted claim without a showing of cause or prejudice if necessary to correct a fundamental miscarriage of justice.  Henderson v. Campbell, 353 F.3d 880, 892 (11th Cir. 2003).  In order to satisfy the miscarriage of justice exception, the Petitioner must show that a constitutional violation has occurred that "probably resulted in a conviction of one who is actually innocent"—that it is more likely than not that no reasonable juror would

have convicted him—which is a stronger showing than is necessary to establish prejudice.  *See* Schlup v Delo, 513 U.S. 298, 327 (1995).  This standard "thus ensures that petitioner's case is truly 'extraordinary.' " *Id.* (citing McCleskey, 499 U.S. at 494).  Such a case is "extremely rare." *Id.* at 324.

This Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits."  Pinholster, 563 U.S. at 181. The state court's factual findings are entitled to a presumption of correctness and to rebut that presumption, the Petitioner must show by clear and convincing evidence that the state court determinations are not fairly supported by the record.  *See* 28 U.S.C. § 2254(e)(1).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions," and "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  *See also* Swarthout v. Cooke, 562 U.S. 216, 221 (2011) ("[W]e have long recognized that 'a "mere error of state law" is not a denial of due process.' " (quoting Engle v. Isaac, 456 U.S. 107, 121, n.21 (1982))).

## Ground 1: Gang Affiliation Evidence

Petitioner contends that the trial court erred, and violated his First and Fourteenth Amendment rights, by allowing repeated references to the Petitioner's alleged gang membership because the prejudice from these references and from Petitioner being required to display a tattoo significantly outweighed any probative value.  ECF No. 6 at 5.  Respondent contends the claim was not raised as a federal claim in the state courts and is thus unexhausted, procedurally barred and otherwise without merit.  ECF No. 19 at 11-13.

The United States Supreme Court held in Duncan v. Henry that a petitioner must present his federal claim in each appropriate state court in order to exhaust the claim prior to seeking federal habeas review.  513 U.S. at 365.  The opportunity provided to the state courts to resolve the federal claim must be "meaningful."  Preston, 785 F.3d at 457 (quoting McNair, 416 F.3d at 1302).  The Petitioner must have apprised the state court of the federal constitutional claim, not just the underlying facts of the claim or a "somewhat similar state-law claim."  Snowden, 135 F.3d at 735 (quoting Harless, 459 U.S. at 5-6).

Petitioner did not present a federal claim in the state trial court.  Prior to trial, Petitioner filed a motion in limine seeking to exclude any reference

to a street gang called the "Latin Kings" and Petitioner's alleged membership in it "without prior approval from the Court."  Ex. A at 24.  No reference was made in the motion to the federal nature of the claim.  On the morning of trial, Petitioner's counsel asked the court to require a proffer of any testimony concerning the "Latin Kings" and his alleged membership in that gang prior to admitting any such testimony.  Ex. B at 8 (transcript pagination).  No argument was made at that time based on the United States Constitution.  The trial court agreed to require a proffer before any evidence concerning the gang was admitted.  Ex. B at 9.

During trial, the state called Ashley Chaganis to testify.  Ex. C at 180.  Trial counsel requested the proffer at that time, and testimony was proffered that Petitioner was wearing a turtleneck sweater or shirt that covered a tattoo on his neck.  Chaganis testified on proffer that the tattoo said "King Bolo," and that Petitioner told her "Bolo" meant "crazy."  Ex. C at 182.  As to the reference to "King," she said, "As far as I know, it's affiliated with a gang" and that Petitioner told her it referred to the gang known as "Latin Kings."  *Id.*  She testified on proffer that she was afraid of Petitioner because he was in a gang, so when he told her to take him to Orlando, to stay in a motel, to come to his place, and to give him money, she did so.  Ex. C at 183-84.  The prosecutor argued this testimony was relevant

because it explained that Chaganis and Ariel Garis did the things they did during the incident and afterward because they believed Petitioner to be in a gang and that he would cause harm to them if they did not comply.  Ex. C at 185.

Defense counsel countered that the evidence should be excluded because it was "extremely prejudicial" and not relevant to anything Petitioner has done.  Ex. C at 186.  He contended that the fact that Petitioner has tattoos is not relevant in any way, that there was no evidence to show that the "Latin Kings" was a criminal organization, and that no gang expert was expected to testify.  Ex. C at 185-86.  He also argued that Chaganis testified she never personally felt threatened.  Ex. C at 185-86.

The trial court ruled that the Chaganis could testify to what Petitioner told her about the tattoo and that she believed from what he said that Petitioner was a member of the "Latin Kings" gang.  Ex. C at 187.  The trial court did impose certain limitations on the testimony, stating:

> THE COURT:  All right.  Here's what I'm going to do.  I am going to allow this witness to testify about what Mr. Rodriguez told her about the tattoo.  That is it.  She may not testify about the significance of the Latin Kings, she may not testify about their criminal or otherwise activities.  She may simply testify that Mr. Rodriguez told her that the tattoo that he showed her said what it said and that she believed from what he said that he was a member of the Latin Kings.

>    MR. GRABEL (prosecutor):  And that she followed his direction based upon what he had told her?
>
>    THE COURT:  If that's her testimony, then that's fine.
>
>    . . . .
>
>    THE COURT:  But I would not allow her to get into anything concerning the nature of the Latin Kings.

Ex. C at 187.  Both Ashley Chaganis and Ariel Garis were allowed to testify to Petitioner's affiliation with the "Latin Kings."  During closing argument, the prosecutor argued, "[L]adies and gentlemen, Ashley and Ariel told you that he said he was a member of the Latin Kings, and they were afraid of him for that reason.  And she came to testify under armed guard, armed guard."  Ex. F at 579.  Defense counsel's objection to this comment was overruled.

Ashley Chaganis testified before the jury that Petitioner has a tattoo on his neck covered with a turtleneck sweater.  Ex. C at 189.  She testified that the tattoo said "King Bolo," and when asked if Petitioner "told her whether he was a member of any organization that is indicated by the tattoo," she said he told her it meant he was a member of the Latin Kings."[3] *Id.*  In addition, during Chaganis's testimony, the judge allowed the prosecutor to require Petitioner to display the "Latin Kings" tattoo to the

---

[3] The jury later heard that Chaganis told law enforcement that Petitioner said he was in a gang, the "Latin Kings."  Ex. D at 284.

jury, after which the judge asked, "Did you all see it?  All right."  Ex. C at

190.  The trial court similarly allowed Ariel Garis to testify that Petitioner

told her the "King Bolo" neck tattoo indicated his "nickname."  Ex. E at 433.

When asked if it had "anything to do with any organizations," Garis said he

told her it was the "Latin Kings" and that it was a gang.  Ex. E at 433-34.

Chaganis further testified that she and Petitioner made a plan for the

robbery of John Curtis after she visited her friend, Ariel Garis, in John

Curtis's room in the Red Roof Inn in Gainesville, Florida.  Ex. C at 198,

211.  While there with Garis, Chaganis observed Curtis in possession of a

large amount of money and cocaine.  She related this information to

Petitioner and a plan was formulated in which she would take Petitioner

and his friend, David Nieves, to the victim's hotel room at the Red Roof Inn

so that they could take the money and drugs from John Curtis.  Ex. C at

205.  She, along with Petitioner and Nieves, went to the Red Roof Inn in

the early morning hours of April 20, 2006, and she called Garis, who was in

Curtis's room.  Ex. C at 206.  Chaganis testified that she asked Garis to

come downstairs to talk under the pretext that she had been kicked out of

her grandmother's home.  Ex. C at 209.  When Garis came down to the

car, Petitioner told her of the plan to go into Curtis's hotel room and take

the money and drugs.  Ex. C at 211.  Chaganis said Garis began to cry and

beg them not to rob Curtis, who she said was her friend.  Petitioner took Garis back to the hotel room and Chaganis left.  Ex. C at 213.

The next time she saw Petitioner, Chaganis testified, was when he brought Garis back to Chaganis's house.  Garis had on the same pajamas she had on at the Red Roof Inn and was crying and shaking.  Chaganis testified that Petitioner was "covered in blood."  Ex. C at 213-14.  Chaganis said Petitioner told her Curtis "was gone" and that he had hit the victim "over and over."  Ex. C at 215.  The victim did not die, however, but was left in a coma.  Petitioner told Garis to go home and told Chaganis to take him to Orlando, which she did.  Ex. C at 217.  Chaganis testified that she only meant for there to be a robbery, and that she got $4,000 from it, along with some of the cocaine.  Ex. C at 220.  Chaganis was charged with attempted first-degree murder and robbery with a firearm, and entered a negotiated plea to robbery, for which she expected to receive 364 days in jail followed by two years of probation.  Ex. C at 228-29.

As noted earlier, Ariel Garis also testified about Petitioner's tattoo. Ex. E at 433-34.  She also testified about coming down from the victim's Red Roof Inn hotel room to meet with Chaganis and finding Petitioner in the car.  She said she was afraid and began crying.  When Petitioner asked her about the victim having money in the room, Garis said she told him she

did not know about any money, after which Petitioner threatened to kill her husband and mother. Ex. E at 448. Garis said he had a gun and "[h]e told me there were five other people in the building already and he kept getting on the cell phone telling them to kick the door down. I said no, and he kept calling them back and getting off the phone. And then he told me that if I didn't do it they would kick the door in and kill him." Ex. E at 448.

Garis testified she then went back to Curtis's room with Petitioner, who still had the gun. Ex. E at 448-49. Another man she did not know joined them as they went up to the room. Ex. E at 449. Garis testified that Petitioner woke Curtis up and asked him where the money was. When Curtis responded he did not have any, Petitioner began to hit him with the gun. Garis testified that after Petitioner found a bag, he asked Curtis why he lied about the money. She said Curtis told him it was not his and began screaming for help. After that, she said, Petitioner beat Curtis with the gun "for a while" while she continued to scream and cry. Ex. E at 450-53.

Garis testified that Petitioner told her to come with him when he left and made her drive around the hotel looking, unsuccessfully, for the other man, who had run away. They then went to Chaganis's house. Ex. E at 454-56. She said she was still crying and still in her pajamas, which were

torn, and Petitioner had blood on his clothes and shoes.  When Chaganis asked Petitioner what happened, he told her, "He's gone."  Ex. E at 457.

Garis testified that she was allowed to go home to wait for Petitioner, but she did not call the police because she was afraid he would harm her family.  Ex. E at 457-59.  She said Petitioner warned her she would be watched and she said she did see a black car following her.  Ex. E at 483.  She testified that a black car also sat in front of her house, so she was afraid to report the incident.  Ex. E at 479.  Garis testified she then drove to Orlando to meet with Ashley, who told her she had gotten $4,000 from the robbery.  Garis said she picked up Petitioner in Orlando and took him several different places.  After leaving her car, Petitioner drove her to Mexico against her will because she was still afraid of him.  Ex. E at 462-66.  Garis testified that in Mexico they first stayed in hotels, and then in a house with guards in front and that Petitioner raped her and left her with nothing to eat or drink.  Ex. E at 468.  She was finally able to run away and report Petitioner to the police.  Ex. E at 469.  Garis was initially arrested on arriving back in the United States, but eventually was determined to have been a victim.

Petitioner testified in his defense and told the jury that he only went to Curtis's hotel room because Chaganis told him Garis was dating a "dope

boy" and wanted to leave him but was afraid to do so.  Ex. E at 511.  He testified that a friend, David Nieves, gave him a ride and when they reached the Red Roof Inn, Ariel came down from the room but said she had to go back to get her things before she could leave.  Ex. E at 514. When he, Garis, and Nieves went to the room, Petitioner testified, Curtis attacked them and a fight ensued.  Ex. E at 514.  Petitioner testified he kicked Curtis twice and Nieves hit him twice with a gun they were fighting over, and he and Garis left the room.  Ex. E at 516.  He testified that Nieves stayed in the room after he and Garis left.  Ex. E at 517.

On the day of the incident, when Curtis was found later that morning by hotel personnel, he was lying on the floor still alive and breathing, but with difficulty.  Ex. B at 100-01.  His feet were bound by what looked like a white fabric.  Ex. B at 106.  The room was in disarray, with the mattress off the bed and "blood everywhere."  *Id.;* Ex. C at 129.  Blood was found in many locations in the hotel room—on the walls, the bed, and the floor in a "substantial amount," on the victim, on the hotel room door, and into the hallway.  Ex. C at 129; Ex. B at 58-61.  Curtis's face was swollen and "his facial features were not in their proper location."  Ex. C at 129.  Once at the emergency department, Curtis was found to have multiple head injuries including multiple areas of skull fractures and lacerations.  Ex. D at 296-99.

He was not speaking, but responded by movement to pain. *Id.* He had

decreased neurological reflexes. Ex. D at 299. He had surgery to stabilize

portions of his skull and to relieve pressure on the brain. Ex. D at 301-02.

When law enforcement saw Curtis in the hospital, he was unconscious.

Ex. B at 67.

Shoes belonging to Petitioner, according to Ashley Chaganis, and

bearing the victim's blood, were later found at her residence by her

grandmother, who gave them to law enforcement. Ex. B at 143; Ex. C at

171, 215; Ex. E at 378-79. A shoe print in the victim's blood found on a

pillowcase taken from the victim's hotel room was identified as matching

the shoes belonging to Petitioner. Ex. E at 381, 408. A handgun, room

key, and bullet was found outside the Red Roof Inn. Ex. D at 311. The

handgun had the victim's blood on it but not Petitioner's DNA. Ex. E at

383, 386. A beer bottle found at the rear of the hotel bore fingerprints and

DNA belonging to Petitioner. Ex. D at 326-28; Ex. D at 339-40; Ex. E at

372. The jury found Petitioner guilty of attempted second-degree murder

and that in the course of the offense carried or used a firearm; armed

robbery and in the course of the offense carried or used a firearm; conspiracy, and false imprisonment.[4]  Ex. F at 687.

During Petitioner's objections to the references to the "Latin Kings" in the trial court, he did not raise a federal constitutional claim or federal precedent as a basis to exclude the gang references.  On appeal, represented by counsel, Petitioner contended that the trial court abused its discretion in allowing into evidence testimony about Petitioner's "King Bolo" tattoo and testimony that he told Chaganis and Garis he was in the "Latin Kings" gang.  Ex. H.  Petitioner argued on appeal that the evidence was more prejudicial than probative and, under section 90.403, Florida Statutes,[5] and state law precedent, evidence of a defendant's membership in a gang should have been excluded.  *See* Ex. H at 19-20.  Petitioner did cite the United States Supreme Court case of <u>Dawson v. Delaware</u>, 503 U.S. 159 (1992), for the proposition that gang membership may be relevant only in limited instances and can improperly invite the jury to infer that the

---

[4] While the jurors were deliberating, the jury sent out questions asking for a transcript of "Ashely's, Jerry's and Ariel's testimony."  Ex. F at 673.  The jury also asked, "Where is David [Nieves]?"  Ex. F at 674.  The jury later sent out a question asking if the principal rule applies to the actual possession of a firearm.  Ex. F at 677.

[5] Section 90.403, Florida Statutes (2006), provided in pertinent part that "[r]elevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."

defendant acted in accord with a certain set of beliefs rather than determining the defendant's motives through other evidence.  Ex. H at 21 (citing Dawson, 503 U.S. at 166).  The direct appeal did not, however, request the state court to determine if admission of the evidence concerning the "Latin King" gang affiliation and Petitioner's neck tattoo violated his First and Fourteenth Amendment constitutional rights.  The state First District Court of Appeal affirmed without explanation.  Assuming without deciding that Petitioner adequately exhausted his federal claim in the state courts by citation to Dawson, this claim should be denied as meritless.[6]

In Dawson, the state had presented evidence of the defendant's membership in the Aryan Brotherhood and his gang tattoo to support an aggravating factor in a capital sentencing proceeding.  503 U.S. at 161. The Supreme Court held that the First Amendment protects an individual's right to join groups and to associate with others holding similar beliefs, but

---

[6] Whether Petitioner's citation to Dawson in his appellate brief constitute grounds sufficient to exhaust his federal claim is a close question.  Although the appellate brief cited Dawson, and although Dawson did involve federal constitutional law, Petitioner's single reference to Dawson was made primarily to support a state-law evidentiary objection rather than a constitutional claim.  This single reference to Dawson can be considered "no more than the scattering of 'some makeshift needles in the haystack of the state court record.' "  Hartge v. McDonough, 210 F. App'x 940, 943 (11th Cir. 2006) (unpublished) (quoting McNair, 416 F.3d at 1303 (citation and quotation marks omitted)).

disagreed that evidence of such membership could never be admitted.  503 U.S. at 164.  The Court in Dawson did find in that case that admission of the gang relationship was "constitutional error" violating both the First and Fourteenth Amendments, *id.* at 160, because the evidence submitted was "totally without relevance to Dawson's sentencing proceeding."  *Id.* at 165. The Court made clear that "the Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations." *Id.* at 165.  The Supreme Court also noted that membership in a gang was found proper in United States v. Abel, 469 U.S. 45 (1984), as impeachment evidence showing that members of the Aryan Brotherhood were sworn to lie for each other.  Dawson, 503 U.S. at 164.

In United States v. Bradberry, 466 F.3d 1249 (11th Cir. 2006), the Eleventh Circuit found that evidence of the defendant's gang membership was not erroneously admitted pursuant to Federal Rule of Evidence 403, under which relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.[7]  The evidence of gang membership "helped explain why they were at the school at that time" and it "made the government's theory of the case more likely."  *Id.* at 1253-54.  Because the case presented a close question, "it fell squarely

---

[7] Federal Rule of Evidence 403 and section 90.403, Florida Statutes, are similar.

within the ambit of the [trial] court's sound discretion." *Id.* at 1254. In

United States v. Ozuna, 674 F.3d 677 (7th Cir. 2012), the court noted that

when considering the probative value of the evidence of gang membership

as compared to the possible prejudice, the trial court "saw the evidence

unfold and was in the best position to evaluate the probative value of the

gang affiliation evidence while weighing that value against any potential

prejudice." *Id.* at 682.

Petitioner similarly contended in the state courts that the admission of

evidence concerning his affiliation with the "Latin Kings" was more

prejudicial than probative. On appeal, the state district court of appeal

affirmed without explanation. "Where a state court's decision is

unaccompanied by an explanation, the habeas petitioner's burden still must

be met by showing there was no reasonable basis for the state court to

deny relief." Richter, 562 U.S. at 98. The state district court of appeal

could reasonably have concluded, under the state evidentiary rule cited,

that the probative value of evidence of Petitioner's statements that he was

in the "Latin Kings" gang, and evidence of his tattoo, was not substantially

outweighed by the danger of unfair prejudice. The appellate court could

also have reasonably determined under the holding in Dawson that based

on the trial court record no constitutional violation occurred because the

evidence was relevant to issues in the case.  The state court's adjudication is entitled to AEDPA deference.  *See* Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1346 (11th Cir. 2013) ("It is well settled that state court adjudications are entitled to AEDPA deference even if they are unaccompanied by opinions.") (citing Pinholster, 563 U.S. at 188).

Moreover, a state trial court's evidentiary rulings do not provide a basis for federal habeas relief absent a showing that the ruling affected the fundamental fairness of the trial.  *See* Sims v. Singletary, 155 F.3d 1297, 1312 (11th Cir. 1998).  "A Petitioner must show that the ruling was more than merely erroneous; it must have had " '[a] substantial and injurious effect or influence in determining the jury's verdict.' " Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (applying the harmless error standard for federal habeas review of constitutional error set forth in Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  On federal habeas corpus review regarding a state court's admission of evidence, the court will "determine only 'whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial.' " Hill v. Sec'y, Florida Dep't of Corr., 578 F. App'x 805, 810 (11th Cir. 2014) (unpublished) (quoting Futch v. Dugger, 874 F.2d 1483, 1487 (11th Cir. 1989)).  "The evidence must be so inflammatory or gruesome, and so critical that its introduction denied

petitioner a fundamentally fair trial." *Id.* To constitute a violation of a defendant's due process rights, the evidence "must have been (1) erroneously admitted, and (2) 'material in the sense of a crucial, critical, highly significant factor in the [defendant's] conviction.' " Hill, 578 F. App'x at 810 (unpublished) (quoting Williams v. Kemp, 846 F.2d 1276, 1281 (11th Cir. 1988)).

Petitioner has failed to demonstrate that admission of the very limited "Latin Kings" evidence had a substantial and injurious effect on the verdict and that it was "material" in the sense of being a crucial, critical, or highly significant factor in Petitioner's convictions. The testimony of Chaganis and Garis placed Petitioner at the scene and directly implicated him in the beating Curtis and the taking of money and drugs from him. It also supported the charges of conspiracy and the false imprisonment of Garis. The evidence of gang membership was not a critical or highly significant factor in his convictions.

Moreover, under the principle stated in Dawson, the gang references were not improper because they were relevant to helping explain the actions of two of the State's witnesses, Chaganis and Garis. Petitioner contends that the prosecutor never clearly showed that Petitioner's gang affiliation was the direct impetus for any of the actions of Chaganis and

Garis.  However, a jury is entitled to draw reasonable inferences from the evidence, in which both Chaganis and Garis testified about Petitioner's gang affiliation, his threats, and their fear of him.  *See, e.g.*, Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012).  It is the trier of fact's responsibility "to draw reasonable inferences from [the] basic facts."  Schlup, 513 U.S. at 340.  Whether Chaganis and Garis were fearful of Petitioner, in whole or in part, due to knowledge of Petitioner's gang affiliation and thus followed his directions, was a reasonable inference the jury was entitled to draw.

The Supreme Court in Dawson made clear that there is no per se constitutional bar to admission of evidence concerning gang affiliation, which is properly admissible if relevant to issues in the case.  The evidence of Petitioner's gang affiliation was relevant to help explain the actions of Chaganis and Garis in this case and was not admitted to show Petitioner had bad character or a criminal background.  Further, the evidence relating to the "Latin Kings" was not made a feature of the trial and the trial court limited any reference to criminal activity by the gang or criminal proclivity of its members.  *See* Ex. C at 187.  The state courts' adjudication concluding that the probative value of the evidence was not substantially outweighed by unfair prejudice is entitled to deference, and has not been shown to be incorrect or unreasonable.

Accordingly, even if Petitioner's claim is not procedurally defaulted, which is a close question in this case, he has failed to demonstrate under 28 U.S.C. § 2254(d) that the adjudication of the state courts resulted in a decision that was contrary to, or an unreasonable application of, <u>Dawson</u> or any other federal law as determined by the Supreme Court, or that it resulted from an unreasonable determination of the facts in light of the evidence in the state court record. Relief on this claim should be denied.

## Conclusion

Based on the foregoing, Petitioner Jerry Charles Rodriguez, is not entitled to federal habeas relief. Accordingly, the amended § 2254 petition (ECF No. 6) should be denied.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner fails to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000) (explaining substantial showing) (citation omitted). Therefore, the Court should deny a certificate of appealability.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  The parties shall make any argument as to whether a certificate should issue by objections to this Report and Recommendation.

Leave to appeal in forma pauperis should also be denied.  *See* Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed, the court may certify appeal is not in good faith or party is not otherwise entitled to appeal in forma pauperis).

## <u>Recommendation</u>

It is therefore respectfully **RECOMMENDED** that the Court **DENY** the amended § 2254 petition (ECF No. 6).  It is further **RECOMMENDED** that a certificate of appealability be **DENIED** and that leave to appeal in forma pauperis be **DENIED**.

**IN CHAMBERS** at Tallahassee, Florida, on April 11, 2017.


S/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. _See_ 11th Cir. R. 3-1; 28 U.S.C. § 636.**